UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

GINA M. MILES,                                    Case No. 1:16-cv-440
        Plaintiff,                                Dlott, J.
                                                  Litkovitz, M.J.
    vs.

COMMISSIONER OF                                   **REPORT AND**
SOCIAL SECURITY,                                  **RECOMMENDATION**
        Defendant.

Plaintiff Gina Miles, brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3)

for judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying plaintiff's application for child's insurance benefits ("CIB") and

supplemental security income ("SSI"). This matter is before the Court on plaintiff's statement of

errors (Doc. 11) and the Commissioner's response in opposition (Doc. 16).

**I. Procedural Background**

Plaintiff was born in 1991 and turned 18 in September 2009. In 2013, she filed

applications for CIB and SSI alleging a disability onset date of January 1, 2000, i.e., before her

22nd birthday. Plaintiff alleges disability due to depression, bipolar disorder, back pain, and

being on an individualized education plan ("IEP"). (Tr. 211, 220). Plaintiff's applications were

denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted

a *de novo* hearing before administrative law judge ("ALJ") Peter J. Boylan. Plaintiff, her

mother, and a vocational expert ("VE") appeared and testified at the ALJ hearing. On March 26,

2015, the ALJ issued a decision denying plaintiff's applications. Plaintiff's request for review by

the Appeals Council was denied, making the decision of the ALJ the final administrative

decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for SSI, plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. *Id.* An individual who has attained the age of 18 is considered disabled for purposes of SSI if she suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). The impairment must render the individual unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B). An individual over the age of 18 who is disabled is entitled to CIB if her disability began before she attained the age of 22 and she meets certain eligibility requirements. 20 C.F.R. § 404.350.

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

2

> 5) If the claimant can make an adjustment to other work, the claimant is not
> disabled. If the claimant cannot make an adjustment to other work, the claimant
> is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§

416.920(a)(4)(i)-(v), 416.920(b)-(g)). The claimant has the burden of proof at the first four steps

of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th

Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform

the relevant previous employment, the burden shifts to the Commissioner to show that the

claimant can perform other substantial gainful employment and that such employment exists in

the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir.

1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. Born [in] 1999, the [plaintiff] had not attained age 22 as of January 1, 2000, the
> alleged onset date (20 CFR 404.102, 416.120(c)(4) and 404.350(a)(5)).
>
> 2. The [plaintiff] has not engaged in substantial gainful activity since January 1,
> 2000, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3. The [plaintiff] has the following severe impairments: borderline intellectual
> functioning and an affective disorder (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The [plaintiff] does not have an impairment or combination of impairments that
> meets or medically equals the severity of one of the listed impairments in 20 CFR
> Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526,
> 416.920(d), 416.925 and 416.926).
>
> 5. After careful consideration of the entire record, the undersigned finds that the
> [plaintiff] has the residual functional capacity [("RFC")] to perform a full range of
> work at all exertional levels but with the following non-exertional limitations.
> The [plaintiff] is limited to simple, routine, and repetitive tasks. The [plaintiff] is
> unable to perform at a production-rate pace, such as generally associated with
> jobs like assembly line worker, but she is able to perform goal-oriented work,

such as generally associated with jobs like office cleaner. The [plaintiff] is unable to have fast-paced work. The [plaintiff] is limited to simple, work-related decisions. The [plaintiff] is limited to occasional and superficial interaction with supervisors and coworkers, and she cannot interact with the public as part of her work duties. The [plaintiff] is limited to tolerating occasional changes in a routine work setting.

6. The [plaintiff] has no past relevant work (20 CFR 404.1565 and 416.965).

7. The [plaintiff] was born [in] 1991 and was 8 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The [plaintiff] has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the [plaintiff] does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[1]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from January 1, 2000, through the date of this decision (20 CFR 404.350(a)(5), 404.1520(g) and 416.920(g)).

(Tr. 26-36).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

---

[1]The ALJ relied on the VE's testimony to find that plaintiff would be able to perform representative medium, unskilled jobs, such as packer (1,000 jobs regionally; 80,000 jobs nationally), cleaner (1,700 jobs regionally; 190,000 jobs nationally), and materials handler (1,200 jobs regionally; 150,000 jobs nationally). (Tr. 35, 75).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Specific Error

On appeal, plaintiff raises a single issue: whether the ALJ erred by failing to find that her intellectual disability meets the criteria of Listing 12.05C. (Doc. 11 at 6). Plaintiff argues the ALJ erred in finding that her sub-70 IQ scores were invalid. (*Id.* at 7-11). Further, plaintiff contends that substantial evidence does not support the ALJ's conclusion that plaintiff does not have the required deficits in adaptive functioning. (*Id.* at 11-13). Finally, plaintiff argues that her affective disorder constitutes a non-related severe impairment for purposes of Listing 12.05C. (*Id.* at 13-14).

5

Listing 12.05 contains an introductory paragraph with the diagnostic description of

"intellectual disability" and four sets of criteria set forth in paragraphs (A)-(D). 20 C.F.R. Pt.

404, Subpt. P, App. 1, § 12.05. Listing 12.05 provides in relevant part:

> 12.05 Intellectual disability: Intellectual disability refers to significantly
> subaverage general intellectual functioning with deficits in adaptive functioning
> initially manifested during the developmental period; i.e., the evidence
> demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A,
> B, C, or D are satisfied.
> . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical
> or other mental impairment imposing an additional and significant work related
> limitation of function[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

To meet Listing 12.05 for intellectual disability, the impairment must satisfy both the

diagnostic description and any one of the four sets of criteria. *Foster v. Halter*, 279 F.3d 348,

354 (6th Cir. 2001) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A)). In satisfying the

diagnostic description for intellectual disability, a claimant must demonstrate: (1) significantly

subaverage general intellectual functioning; (2) deficits in adaptive functioning; and (3) such

deficits in adaptive functioning initially manifested before age 22. *Id*.

In determining that plaintiff did not meet the requirements of Listing 12.05C, the ALJ

acknowledged that plaintiff had full scale IQ scores of 66 and 69 but found that the validity of

these scores was undermined by additional findings of the examining psychologists. (Tr. 28).

Specifically, the ALJ noted that Dr. Frank Wood, Ph.D., the psychologist who assessed a full

scale IQ score of 66, indicated that plaintiff "did not have mental retardation and stressed the

'meaningful difference' exhibited in academic achievement testing, wherein [plaintiff] generally

performed at the borderline range." (*Id.*). As to the full scale IQ score of 69, the ALJ noted that

the examining psychologist, Dr. Richard E. Sexton, Ph.D., "diagnosed [plaintiff] with borderline intellectual functioning because her clinical presentation suggested greater intellectual ability than her psychometric testing." (Tr. 28-29). As to adaptive functioning, the ALJ found that plaintiff did not have listing-level deficits because she "has lived on her own while raising two young children" and "manag[ed] her own budget on the limited income she was receiving in state-based benefits for her children." (Tr. 29).

Here, the ALJ's determination that plaintiff failed to meet Listing 12.05C is not supported by substantial evidence. This report will address each of the ALJ's reasons for this determination in turn.

> 1. *Substantial evidence does not support the ALJ's determination that plaintiff did not satisfy the threshold requirement of "deficits in adaptive functioning initially manifested . . . before age 22."*

The Commissioner argues the ALJ properly considered plaintiff's ability to live on her own while raising two children and manage her own budget in finding that she did not have deficits in adaptive functioning for purposes of Listing 12.05. (Doc. 16 at 7-8). The Commissioner also noted positively the ALJ's consideration of plaintiff's ability to prepare meals, clean her residence, do laundry, shop, maintain personal care, be in a relationship with the father of her youngest child, socialize at parties, visit her mother, work well with others, and read mystery novels. (*Id.* at 8).

"*Adaptive functioning* refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 42 (4th ed., text rev. 2000). "Adaptive functioning" includes the plaintiff's "effectiveness in areas

such as social skills, communication, and daily living skills." *West v. Comm'r Soc. Sec. Admin.*, 240 F. App'x 692, 698 (6th Cir. 2007) (citing *Heller v. Doe by Doe*, 509 U.S. 312, 329 (1993)). Intellectual disability requires concurrent deficits or impairments in present adaptive functioning in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. DSM-IV at 49.

Here, substantial evidence does not support the ALJ's determination that plaintiff does not have listing-level deficits in adaptive functioning that manifested before age 22. In 2004, when plaintiff was 12, she scored a 67 on the Vineland Adaptive Behavior Scales, which placed her in the first percentile of functioning compared to her same-age peers. (Tr. 351). In 2007, when plaintiff was 15, her evaluating psychologist noted that plaintiff "remains well below average in the cognitive and adaptive areas." (*Id.*). In 2009, when plaintiff was 17, her results on the Phillip Roy Pre-Test (an employment-academic related vocational test) showed that plaintiff had "very little understanding of general employment skills, social skills, consumer skills, financial skills, and everyday laws and rules," which suggested that she "will have difficulty navigating the employment system, making purchases appropriate to her financial situation, developing a personal budget, interacting with peers and superiors on the job." (Tr. 399). In 2011, when plaintiff was 19, she scored a 41 on the Adaptive Behavior Assessment System, Second Edition ("ABAS-II"), which placed her in the extremely low range. (Tr. 329). In explaining these results, Dr. Wood noted that plaintiff scored in the extremely low range in the following component domains: (1) conceptual, reflecting adaptive behavior limitations with communication, functional academics, and self-direction; (2) social, reflecting adaptive behavior limitations in social interactions and leisure; and (3) practical, reflecting adaptive behavior

limitations in the areas of school living and health and safety. (*Id.*). These results suggested that plaintiff "will likely have difficulty communicating needs in the class and in her community life, engaging in the general education curriculum, ensuring quality personal health, managing her behavior in and out of school, and engaging appropriately and effectively with peers, staff and superiors on the job." (Tr. 399). Dr. Wood concluded that plaintiff's ABAS-II results "reflect that [she] has adaptive behavior deficits in all of the skill areas indicated by significantly deficient scores in each of the four domains." (Tr. 329). In 2012, when plaintiff was 20, her IEP evaluator opined that she "has a high probability of struggling with self-care, community use, self-direction, and social interactions." (Tr. 398).

The ALJ ignored this overwhelming evidence of deficits in adaptive functioning manifesting before age 22. Instead, in finding that plaintiff did not have listing-level deficits in adaptive functioning, the ALJ noted that plaintiff lived on her own while raising two young children and managed her own budget. (Tr. 29). These findings mischaracterize the record. First, plaintiff told Dr. Sexton in April 2013 that she lived in a rented apartment with her two young children. (Tr. 360). However, in relying on this evidence, the ALJ ignored the December 2012 assessment of Stacy Schwartz-Landesberg, who noted in a December 2012 assessment that the Hamilton County Department of Job and Family Services ("HCJFS") was investigating plaintiff for medical neglect of her 18-month-old oldest child. (Tr. 262). Ms. Schwartz-Landesberg noted that although this child was born with a heart condition and hypertension and needs regular medical care from cardiologists and neurologists at Children's Hospital, plaintiff missed several medical appointments for his treatment. (Tr. 266-67). Ms. Schwartz-Landesberg also indicated that plaintiff "did not show any range of emotion when asked about her children, particularly her son and his health issues" and said that her son "needs to learn to manage his

condition on his own." (Tr. 268). Ms. Schwartz-Landesberg opined that plaintiff "has difficulty with basic empathy" and "has very limited insight into herself and this likely limits her ability to respond to the emotional needs of her children and others." (*Id.*). Further, in plaintiff's March 2012 IEP evaluation, it was noted that "[s]he does not always exhibit appropriate child care skills, as was noted by support staff when reporting on a visit by the student and her child." (Tr. 398). Moreover, in July 2014, plaintiff's therapist noted that plaintiff was facing an eviction due to an unpaid energy bill. (Tr. 375). By the time of plaintiff's administrative hearing in March 2015, she and her children were again living with plaintiff's mother. (Tr. 45, 64-65). At that hearing, plaintiff's mother testified that plaintiff was unable to independently care for her two children. (Tr. 69).

Second, at a July 9, 2014 intake interview to receive mental health treatment from the Central Community Health Board ("CCHB"), plaintiff stated that she was "able to budget what limited finances she receives for her children." (Tr. 376). However, in relying on this stray citation from the record, the ALJ ignored the results of plaintiff's Phillip Roy Pre-Test, which suggested she would have difficulty "making purchases appropriate to her financial situation [and] developing a personal budget." (Tr. 399). Further, continued treatment notes from plaintiff's therapist at the CCHB show that on July 24, 2014 she was facing eviction due to an unpaid energy bill. (Tr. 375).

In sum, the limited evidence of plaintiff's failed attempt to live independently with her children does not constitute substantial evidence to overcome the overwhelming evidence of plaintiff's deficits in adaptive functioning. *See Vorhis-Deaton v. Comm'r of Soc. Sec.*, 34 F. Supp. 3d 809, 818 n.8 (S.D. Ohio 2014) ("An ALJ cannot simply 'pick and choose' evidence in the record 'relying on some and ignoring others, without offering some rationale for his

decision.'"); *Rothgeb v. Astrue*, 626 F. Supp. 2d 797, 808 (S.D. Ohio 2009) ("[A]n ALJ cannot

pick and choose which evidence to rely upon."); *Robinson v. Barnhart*, 366 F.3d 1078, 1083

(10th Cir. 2004) ("The ALJ is not entitled to pick and choose from a medical opinion, using only

those parts that are favorable to a finding of nondisability.").  Further, the record shows that the

brief period of time plaintiff was raising her children on her own while living independently was

unsuccessful inasmuch as (1) HCJFS became involved to investigate a complaint that plaintiff

had medically neglected her oldest child, and (2) plaintiff moved back in with her mother after

facing an eviction due to unpaid bills.

Further, even if there were compelling evidence that plaintiff was able to live on her own,

provide care for her children, and develop a limited budget, this would not constitute substantial

evidence that plaintiff does not have listing-level deficits in adaptive functioning given the

balance of the record evidence of such deficits described above.  *See Brown v. Sec'y of Health &*

*Human Servs.*, 948 F.2d 268, 270 (6th Cir. 1991) (finding that use of public transit, making

change at the grocery store, obtaining a driver's license, visiting friends, doing laundry, and

cleaning is not necessarily inconsistent with a finding of intellectual disability under Listing

12.05C).  *See also Vorhis-Deaton*, 34 F. Supp.3d at 821 (finding that even though plaintiff had

once lived on her own, she had significant deficits in adaptive functioning as evidenced by the

fact that she "had actually moved in with her mother, so that she could help Plaintiff with her

children"); *Clark v. Comm'r of Soc. Sec.*, No. 3:12-cv-259, 2013 WL 4518742, at *5-6 (S.D.

Ohio Aug. 26, 2013) (finding that even though plaintiff lived alone, "substantial evidence

establishes conclusively that [she] does not meet the standards of independence" of a woman of

her age given the substantial evidence of deficits in adaptive functioning in the areas of

communication, self-care, home living, use of community resources, work, and health and safety).

Based on the foregoing, substantial evidence does not support the ALJ's determination that plaintiff does not have the requisite deficits in adaptive functioning for purposes of Listing 12.05.

> 2. *Substantial evidence does not support the ALJ's conclusion that plaintiff does not have a valid IQ score that satisfies the requirements of Listing 12.05C.*

As noted above, the ALJ acknowledged that plaintiff had full scale IQ scores of 66 and 69 but found that the validity of these scores was undermined by additional findings of the examining psychologists. (Tr. 28). Specifically, the ALJ noted that Dr. Wood, who assessed a full scale IQ score of 66, indicated that plaintiff "did not have mental retardation and stressed the 'meaningful difference' exhibited in academic achievement testing, wherein [plaintiff] generally performed at the borderline range." (*Id.*). As to the full scale IQ score of 69, the ALJ stated that Dr. Sexton "diagnosed [plaintiff] with borderline intellectual functioning because her clinical presentation suggested greater intellectual ability than her psychometric testing." (Tr. 28-29). Additionally, in considering plaintiff's RFC, the ALJ noted that some mental health providers indicated that plaintiff's intellectual functioning was average or adequate. (Tr. 31). The ALJ also observed that plaintiff had an overall grade point average of 3.185 when she left school in 2013. (*Id.*).

In responding to plaintiff's argument on appeal that the ALJ erred in finding her sub-70 IQ scores invalid, the Commissioner argues the ALJ properly discounted those scores because the psychologists who assessed them did not diagnose plaintiff with an intellectual disability and indicated that plaintiff's clinical presentation suggested greater intellectual ability than her IQ

scores. (Doc. 16 at 6-7). Despite conceding that a diagnosis of intellectual disability is not required for purposes of Listing 12.05C, the Commissioner nevertheless argues that the lack of such a diagnosis constitutes substantial evidence to support the ALJ's determination that plaintiff's scores were invalid. (*See id.*). The Commissioner also asserts the ALJ properly considered that: (1) some mental health providers indicated that plaintiff's intellectual functioning was average or adequate and (2) she had an overall grade point average of 3.185 when she left school in 2013. (*Id.* at 7). Finally, the Commissioner argues that the opinions of the state agency reviewing psychologists that plaintiff did not meet Listing 12.05C constitute substantial evidence supporting the ALJ's opinion. (*Id.* at 9-10).

The undersigned concludes that substantial evidence does not support the ALJ's determination that plaintiff does not have a valid IQ score that satisfies the requirements of Listing 12.05C. At the time of the ALJ's decision, the Social Security regulations directed that "[i]n cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(D)(6)(c) (2014). A good IQ test should exhibit "reliability, i.e., the consistency of results obtained over time with the same test and the same individual." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(D)(5)(c). "IQ test results must also be sufficiently current for accurate assessment." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.00(D)(10). The regulations explain:

> Generally, the results of IQ tests tend to stabilize by the age of 16. Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior. IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above.

*Id.* "Test results obtained at younger ages are less reliable and valid than test results obtained at older ages." Program Operations Manual System ("POMS") § DI 24515.055(A).[1]

Here, the record reveals that plaintiff's IQ was tested on three occasions. First, a school evaluation team report from 2007 noted that in May 2004 when plaintiff was 12, she received a full scale score of 73 on the Wechsler Intelligence Scale for Children, Fourth Edition ("WISC-IV"). (*See* Tr. 351). No contemporaneous report of this score exists in the record, nor do plaintiff's results on the component subtests. (*See id.*).[2] Second, in March 2011 when plaintiff was 19, she received a verbal comprehension score of 70, a perceptual reasoning score of 65, and a full scale score of 66 on the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"). (Tr. 327-28). Dr. Wood indicated that plaintiff's perceptual reasoning and full-scale scores placed her in the first percentile and the "extremely low" range of cognitive functioning. (Tr. 327). Also in March 2011, plaintiff took the Woodcock-Johnson III ("WJ-III") to determine whether there was "a significant discrepancy between her intellectual ability and her academic achievement." (Tr. 328). Plaintiff received scores in the extremely low range (i.e., third or fourth grade equivalent) in academic applications, academic skills, broad math, broad written language, math calculation, reading fluency, letter-word identification, passage comprehension, and spelling. Plaintiff received scores in the borderline range in written expression, broad reading, applied problems, math fluency, writing samples, and writing fluency. (*Id.*). Dr. Wood concluded from these results that "there were no areas where her academic scores fell significantly below her FSIQ. This lack of discrepancy rules out a Specific Learning

---

[1] The POMS is the operational reference used by SSA staff to conduct daily business. "While these administrative interpretations [POMS] are not products of formal rulemaking, they nevertheless warrant respect." *Washington Dep't of Soc. Servs. v. Keffeler*, 537 U.S. 371, 385 (2003).

[2] That same report noted that plaintiff "was placed in the special education program as a 'cognitively delayed' student at the end of grade 5 (date of 5-19-04). Despite consistent effort on [plaintiff's] part, intervention at school, and help from her mother, [plaintiff] typically performed below grade level even though she had been held back twice. . . ." (Tr. 351).

Disability."[3] (*Id.*). Based on plaintiff's full scale IQ score and deficits in adaptive functioning, Dr. Wood diagnosed plaintiff with a cognitive deficit. (Tr. 329). The summary paragraph of plaintiff's IEP evaluation stated that "this Cognitive Disability is also not caused by mental retardation . . . ." (Tr. 331).

Third, in April 2013 when plaintiff was 21, she received a verbal comprehension score of 74, a perceptual reasoning score of 65, and a full scale score of 69 on the WAIS-IV. (Tr. 365). Dr. Sexton noted that plaintiff's full scale IQ score suggested "that she was functioning at the upper end of the mild range of mental retardation currently." (Tr. 362). Dr. Sexton "thought that she was functioning at the low end of the borderline level clinically." (*Id.*).

This record does not provide substantial support for the ALJ's determination that plaintiff does not meet listing 12.05C for lack of a qualifying IQ score. Taking the lowest IQ score in the series as directed by the regulations, plaintiff's IQ was 73 in 2004, 65 in 2011, and 65 in 2013.[4] The IQ score of 73 that plaintiff received in 2004 when she was 12 is of minimal probative value because it was obtained before plaintiff's IQ stabilized and was only current for two years. *See*

---

[3] A specific learning disability is "diagnosed when the individual's achievement on individually administered, standardized tests in reading, mathematics, or written expression is substantially below that expected for age, schooling, and level of intelligence." DSM-IV at 49. Specific learning disability "includes such conditions as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia," but does not include intellectual disabilities. 20 U.S.C. § 1401(30).

[4] The applicable regulation at the time of the ALJ's decision specifically references the verbal, performance, and full scale IQs of the WAIS-III. Courts have found that the perceptional reasoning score in the WAIS-IV is the functional equivalent of the performance score in the WAIS-III. *See Fatheree v. Colvin*, No. 1:13-cv-1577, 2015 WL 1201669, at *10 (E.D. Cal. Mar. 16, 2015). *See also Plank v. Colvin*, No. 12-cv-4144, 2013 WL 6388486, at *7 (E.D. Pa. Dec. 6, 2013) (noting that under guidance from the Wechsler Series Test administrators the perceptual reasoning score on the WAIS-IV should be substituted for the term "[performance IQ in clinical decision-making and other situations where . . . [performance IQ was] previously used"); *Martin v. Comm'r, Soc. Sec. Admin.*, No. 12-cv-1130, 2013 WL 4512071 (D. Md. Aug. 22, 2013) ("Because the various tests have been modified since the Listings were created, the 'verbal comprehension index score' is the equivalent of 'verbal IQ,' and the 'perceptual reasoning index score' is the equivalent of 'performance IQ.'"); *Smith v. Astrue*, No. 11-cv-948, 2012 WL 2990064, at *3 (S.D. Ill. Jul. 20, 2012) ("On [the WAIS-IV], the verbal comprehension index is the functional equivalent of the verbal IQ on the earlier version, and the perceptual reasoning index is the functional equivalent of the performance IQ on earlier versions."); David Wechsler, *WISC-IV Administration and Scoring Manual* 4 (2003) ("The terms Verbal IQ (VIQ) and Performance IQ (PIQ) have been replaced with the terms Verbal Comprehension Index (VCI) and Perceptual Reasoning Index (PRI) respectively."). Thus, in accordance with 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(D)(6)(c) (2014), the Court will use the perceptual reasoning scores of 65 that plaintiff received in 2011 and 2013.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.00(D)(10); POMS § DI 24515.055(A).  After

plaintiff's IQ stabilized, she received a score of 65 on both occasions when her IQ was tested.

This suggests that plaintiff's score of 65 is reliable.  *See* 20 C.F.R. Part 404, Subpart P, Appendix

1, § 12.00(D)(5)(c) (explaining that a good IQ test should exhibit "reliability, i.e., the consistency

of results obtained over time with the same test and the same individual").

   In discounting these two scores which are consistent with a finding of disability under

Listing 12.05C, the ALJ emphasized that Dr. Wood and Dr. Sexton did not diagnose plaintiff

with mental retardation.  (*See* Tr. 28).  However, a formal diagnosis of mental retardation is not

necessary to meet Listing 12.05C.  "Whether plaintiff was diagnosed with mental retardation is

not dispositive of whether [s]he meets Listing 12.05C."  *Hill v. Comm'r of Soc. Sec.*, No. 1:14-

cv-204, 2015 WL 105097, at *8 (S.D. Ohio Jan. 7, 2015) (Report and Recommendation)

(Litkovitz, M.J.), *adopted*, 2015 WL 545222 (S.D. Ohio Feb. 10, 2015) (Barrett, J.).  *See also*

*Lingo v. Colvin*, No. 3:13-cv-452, 2013 WL 6859870, at *5 (N.D. Ohio Dec. 29, 2013) ("There

is no authority for the proposition that [a claimant] must be able to point to a *diagnosis* of mental

retardation in order to satisfy [Listing 12.05].");  *Breitenstein v. Astrue*, No. 3:10-cv-32, 2011 WL

1235018, at *12 (S.D. Ohio Jan. 6, 2011) (Report and Recommendation) ("[I]nstead of requiring

evidence of a diagnosis of mental retardation, the correct analysis focuses on whether the

evidence of record meets or equals Listing 12.05's introductory paragraph and 12.05C's

criteria."), *adopted*, 2011 WL1234902 (S.D. Ohio Mar. 30, 2011); *Wilkerson v. Comm'r of Soc.*

*Sec.*, No. 3:08-cv-419, 2010 WL 817307, at *13 (S.D. Ohio Mar. 5, 2010) ("Requiring such a

diagnosis in cases of mental retardation would place formalism over substantive evidence.").

   The ALJ also emphasized Dr. Sexton's statement that from plaintiff's clinical

presentation, "[i]t was thought that she was functioning at the low end of the borderline level."

(Tr. 363). Even if plaintiff's IQ score was lower than Dr. Sexton expected based on her clinical presentation, this does not constitute grounds for finding that score invalid. In *Dragon v. Comm'r of Soc. Sec.*, the Sixth Circuit held that substantial evidence did not support the ALJ's conclusion that the examining psychologist's statement that IQ scores were lower than expected completely invalidated those scores. 470 F. App'x 454, 462 (6th Cir. 2012). In so holding, the Sixth Circuit noted that the ALJ improperly ignored the examining psychologist's earlier observation that the claimant "did not appear to exaggerate or minimize her difficulties . . . [and] was adequately motivated." *Id.*

Like the claimant in *Dragon*, Dr. Sexton's full examination supported the validity of plaintiff's 2013 IQ score. Dr. Sexton observed that plaintiff's "level of motivation to participate [was] good" and "[t]here was no apparent tendency on her part to exaggerate or minimize/deny signs or symptoms of emotional distress." (Tr. 360). Additionally, similar to the claimant in *Dragon*, the record evidence supports the validity of plaintiff's IQ scores in 2011 and 2013. As already noted, when plaintiff was 19 in 2011, she placed at the third grade level in reading ability, from the third through the fifth grade level in math ability, and the fourth grade level in writing and spelling ability. (Tr. 329). When plaintiff was 20 and in the tenth grade, she was "enrolled in modified courses in order to meet course requirements" and she was excused from the consequences of not passing the Ohio Graduation Test ("OGT"). (Tr. 399, 407-08). Thus, Dr. Sexton's unexplained comment that "[i]t was thought that [plaintiff] was functioning at the low end of the borderline level clinically" does not constitute substantial evidence to disregard plaintiff's two qualifying IQ scores.

The ALJ also stated that Dr. Wood "stressed the 'meaningful difference' exhibited in academic achievement testing, wherein the claimant generally performed at the borderline

range." (Tr. 28). This statement mischaracterizes Dr. Wood's assessment. Contrary to the
ALJ's determination, plaintiff did not "generally perform[] at the borderline range" on academic
achievement testing. (*Id.*). Rather, on the March 2011 WJ-III achievement test that plaintiff
took when she was 19, she scored in the extremely low range (i.e., third or fourth grade
equivalent) on the majority of test components, including academic applications, academic skills,
broad math, broad written language, math calculation, reading fluency, letter-word identification,
passage comprehension, and spelling. (Tr. 328). Only by ignoring the pervasiveness of these
scores in the extremely low range across the various components of this test was the ALJ able to
characterize plaintiff's performance as generally in the borderline range. Further, the ALJ
ignored Dr. Wood's conclusion that "there were no areas where her academic scores fell
significantly below her FSIQ. This lack of discrepancy rules out a Specific Learning Disability."
(*Id.*). Only because of this lack of discrepancy between plaintiff's IQ scores and academic
achievement test scores was Dr. Wood able to diagnose plaintiff with cognitive disability as
opposed to a specific learning disability. (*See* Tr. 329). To the extent the ALJ relied on the
statement in the summary paragraph of the IEP evaluation report that "there exists a meaningful
difference of 10 points between her FSIQ and her scores on the WJIII," that reliance was in
error. (Tr. 331). This statement in the summary paragraph, which is not a part of Dr. Wood's
Individual Assessment Report, is inconsistent with Dr. Wood's detailed analysis of plaintiff's
test results from which he determined that there was a "lack of discrepancy" between plaintiff's
IQ scores and her academic achievement results. (*See* Tr. 327-28).

Further, the fact that two mental health providers indicated that plaintiff's intellectual
functioning was average or adequate does not constitute substantial evidence to support the
ALJ's rejection of plaintiff's qualifying IQ scores. The record shows that Ms. Schwartz-

Landesberg assessed plaintiff in December 2012 upon referral from HCJFS, which was investigating medical neglect of plaintiff's 18-month-old child. (Tr. 262-63). In a mental status examination, Ms. Schwartz-Landesberg found that plaintiff's intelligence was "average." (Tr. 263). The accompanying narrative summary of plaintiff's evaluation did not provide any rationale for the finding of average intelligence. (*See* Tr. 266-68). In February 2013, therapist Jessica Bavblitz assessed plaintiff as having "adequate" cognitive functioning and "average" intelligence. (Tr. 309, 315). Ms. Bavblitz did not provide any explanation for these findings. (*See* Tr. 309-19).

The conclusory findings of these two therapists who did not have longstanding treatment relationships with plaintiff do not constitute substantial evidence to counter the overwhelming evidence of significantly subaverage intellectual functioning contained in plaintiff's educational records that support plaintiff's qualifying IQ scores. Further, these therapists did not conduct any objective, psychometric testing to support their vague intuition that plaintiff was of average intelligence. *See Dragon*, 470 F. App'x at 464 ("Substantial evidence did not support the ALJ's decision to disregard [plaintiff's] examining doctor's evaluation in favor of a form with little substantive information.").

Additionally, plaintiff's grade point average does not constitute substantial evidence to support the ALJ's rejection of plaintiff's qualifying IQ scores. Plaintiff's high school transcript spans the years 2006 through 2012. (*See* Tr. 393-95). In that time, plaintiff earned 14.250 credits with a cumulative GPA of 3.185. (Tr. 395). The ALJ failed to consider this GPA in the broader context of plaintiff's educational setting. Specifically, the ALJ failed to acknowledge that plaintiff did not achieve these grades in a regular classroom. Instead, she was on an IEP that provided for modified coursework and one-on-one instruction because she was "not meeting

grade level standards in the general educational curriculum." (*See* Tr. 335, 351, 398-99). *See also Dragon*, 470 F. App'x at 462-63 (holding ALJ improperly relied on a plaintiff's graduation from high school as evidence of greater intellectual ability because "[s]he graduated from high school on an individual education plan and never passed her ninth grade proficiency tests").

Finally, the opinions of state reviewing agency psychologists do not constitute substantial evidence to support the ALJ's rejection of plaintiff's IQ scores. The record shows that in April 2013, Todd Finnerty, Psy.D., reviewed plaintiff's records and determined that she does not satisfy Listing 12.05. (Tr. 87-88). Dr. Finnerty did not provide any explanation for this opinion. (*See id.*). On reconsideration in June 2013, Robelyn Marlow, Ph.D., affirmed without explanation Dr. Finnerty's opinion that plaintiff does not satisfy Listing 12.05. (Tr. 110-11).

Initially, the undersigned notes that the ALJ did not rely on the opinions of the state reviewing agency psychologists in determining that plaintiff does not satisfy the requirements of Listing 12.05. (*See* Tr. 28-29). Instead, the ALJ only gave significant weight to the opinions of the state reviewing agency psychologists in the context of formulating plaintiff's RFC based on the functional limitations they identified. (*See* Tr. 33). Thus, the Commissioner's argument that the reviewing psychologists' opinions constitute substantial evidence to support the ALJ's analysis of Listing 12.05 is misplaced. *See Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 524 (6th Cir. 2014) ("In reviewing an ALJ's findings and conclusions, this Court shall not 'accept appellate counsel's *post hoc* rationalization for agency action in lieu of accurate reasons and findings enunciated by the [agency].'") (quoting *Hyatt Corp. v. N.L.R.B.*, 939 F.2d 361, 367 (6th Cir. 1991)); *Romig v. Astrue*, No. 1:12-cv-1552, 2013 WL 1124669, at *6 (N.D. Ohio Mar. 18, 2013) ("[I]t is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration.") (citations omitted).

In any event, the conclusory assertions of the state agency reviewing psychologists do not constitute substantial evidence to support the ALJ's rejection of plaintiff's IQ scores. In evaluating the weight to be afforded to the opinion of a non-examining source, the ALJ "weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)). While the state agency reviewers here are specialists in psychology, they had no examining relationship with plaintiff (in contrast to Dr. Wood and Dr. Sexton), their conclusory findings that plaintiff did not meet Listing 12.05 are wholly unsupported in their opinions, and those findings are inconsistent with the record as a whole, as explained above.

Based on the foregoing, substantial evidence does not support the ALJ's determination that plaintiff does not meet Listing 12.05C for lack of a valid IQ score.

**III.  This case should be reversed and remanded for an award of benefits.**

In a case where the final decision of the Commissioner is not supported by substantial evidence, the Court has authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 100 (1991). Generally, benefits may be awarded immediately "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec. of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994); *see also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Sec. of H.H.S.*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176; *see also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994).

This matter should be remanded for an award benefits. Here, the proof that plaintiff meets the requirements of Listing 12.05C is strong and opposing evidence is lacking in substance. *Faucher*, 17 F.3d at 176.

As explained above, plaintiff's IQ findings on psychological examination are below the qualifying IQ score of 70. In addition, plaintiff's deficits in adaptive functioning are well-documented in the school reports, evaluations, and on testing and satisfy the diagnostic description of Listing 12.05. In addition, it is undisputed that the ALJ found the presence of "a physical or other mental impairment imposing an additional and significant limitation of function," 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.05C, when he found plaintiff suffers from the severe impairment of an affective disorder. (Tr. 26). *See Markle v. Barnhart*, 324 F.3d 182, 188 (3rd Cir. 2003) (citing Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50772 (August 21, 2000) (explaining that a "severe" impairment, as defined in step two of the sequential evaluation, is equivalent to a significant work-related limitation of function)). Based on this affective disorder, the ALJ found that plaintiff was "limited to superficial interaction with supervisors and coworkers, and she cannot interact with the public as part of her work duties." (Tr. 29). On appeal, the Commissioner has not challenged plaintiff's argument that her affective disorder satisfies the requirement of Listing 12.05C. (*See* Doc. 11 at 13; Doc. 16 at 5-10). Thus, because it is undisputed that plaintiff has another severe impairment, no factual issue exists concerning this component of Listing 12.05C.

Finally, although the ALJ's decision does not directly address whether plaintiff's condition meets the threshold requirement of Listing 12.05C of "significantly subaverage general intellectual functioning," *see* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05, the evidence that plaintiff suffered from significantly subaverage general intellectual functioning is strong.

that plaintiff suffered from significantly subaverage general intellectual functioning is strong.
The record shows that plaintiff received "extremely low" or "borderline" scores on the WJ-III in
the areas of reading, mathematics, writing, and spelling. (*See* Tr. 328). Specifically, in 2011
when plaintiff was 19, she received reading scores in the extremely low range, which placed her
at a third grade level. Her math scores ranged from extremely low to borderline, which placed
her at a third grade level for calculation, a fourth grade level for applied problems, and a fifth
grade level for math fluency. Her writing and spelling scores fell within the extremely low to
borderline range, which placed her at a fourth grade level for both subjects. (*Id.*). Based on
these scores as well as her IQ scores, Dr. Wood diagnosed plaintiff with a cognitive deficit. (Tr.
329).

These findings were consistent with earlier and later IEP evaluations. For example, at a
May 2007 evaluation when plaintiff was 15 and in the ninth grade, psychologist D. Kombrinck
noted that plaintiff was placed in the special education program as "cognitively delayed" at the
end of the fifth grade because she was performing below grade level even though she had been
retained twice. (Tr. 351). She was expected to receive failing grades in all ninth grade subjects.
(*Id.*). At a March 2012 evaluation when plaintiff was 20 and in the tenth grade, she was
"enrolled in modified courses in order to meet course completion requirements." (Tr. 399).
Further, plaintiff's participation in the OGT was with accommodations and she was excused
from the consequences of not passing the OGT. (Tr. 407-08). *See Dragon*, 470 F. App'x at 456,
461 (holding that ALJ lacked substantial evidence to conclude that claimant had failed to
establish "significantly subaverage general intellectual functioning with deficits in adaptive
functioning" where claimant participated in a separate educational program and was exempted
from state proficiency tests because she did "not have the necessary skills to pass").

23

Based on the foregoing, the evidence that plaintiff has significantly subaverage general intellectual functioning is strong.  The evidence the ALJ considered in rejecting plaintiff's IQ scores is lacking in substance for the reasons explained above in the Court's analysis of whether plaintiff has a qualifying IQ score.

To summarize, the proof of disability under Listing 12.05 is strong in this case.  The only evidence to the contrary that the ALJ considered in finding that plaintiff does not meet Listing 12.05 is not compelling and does not constitute substantial evidence for the reasons stated above.  Accordingly, it is recommended that the ALJ's decision be reversed and the case be remanded for an award of benefits.

### IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **REVERSED** and this case be **REMANDED** for an award of benefits pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: _3/16/17_          Karen L. Litkovitz
                         United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

GINA M. MILES,                                    Case No. 1:16-cv-440
      Plaintiff,                        Dlott, J.
                                                  Litkovitz, M.J.

    vs.

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.


**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).